UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,
    Plaintiff,      Case No. 17-cr-20464
v.            Hon. Judith E. Levy

D-1 ATHEIR AMARRAH,
    Defendant.
_____/

## UNITED STATES' COMBINED RESPONSE AND BRIEF OPPOSING DEFENDANT'S EMERGENCY MOTION FOR COMPASSIONATE RELEASE

The United States of America opposes the Defendant's motion asking the Court to grant a compassionate release or home confinement to the Defendant. As explained below, the Defendant is not entitled to the relief he seeks, and his motion should be denied.

## BACKGROUND

Defendant Atheir Amarrah ("Amarrah"), Register Number 55758-039, an inmate in the custody of the Federal Bureau of Prisons ("BOP"), filed the instant motion asking the Court to grant him compassionate release after having served less than half of his custodial sentence.

On May 21, 2018, Amarrah pled guilty to one count of conspiracy to pay and receive healthcare kickbacks, in violation of 18 U.S.C. § 371, and four counts of payment or receipt of kickbacks, in violation of 42 U.S.C. § 1320a-7b(b)(1)(A).

Dkt. No. 96.  Amarrah remained on bond pending his sentencing.  However, on

August 1, 2018, Amarrah's bond was revoked after the Court found that he

represented a danger to the community after his attempts to tamper with witnesses

and obstruct justice after his guilty plea. Dkt. No. 106.  On October 30, 2019, the

Defendant was sentenced to 60 months incarceration. Dkt No. 183.  The

Defendant's convictions are in connection with his role as the mastermind in a

scheme to defraud Medicare of almost $2 million. Amarrah is currently designated

to the Loretto Federal Correctional Institute in Loretto, Pennsylvania.  As of April

30, 2020, there have not been any confirmed cases for COVID-19 at FCI Loretto

among inmates and staff.[1]  Amarrah is 45 years old and his projected release date is

November 18, 2022.

Amarrah now asks the Court to grant this relief in the wake of the COVID-

19 pandemic or "coronavirus" because of his risk of contracting the virus given his

medical conditions and his familial circumstances onset by the virus, more

"specifically his wife's ability to adequately provide for their children."  Dkt. No.

190 at 2.

The Bureau of Prisons, however, is already evaluating and releasing inmates

most at risk from the COVID-19 pandemic. Following two recent directives from

---

[1] BOP COVID-19 Tracker, https://bop.gov/coronavirus (last visited April 30, 2020).

the Attorney General, the Bureau of Prisons is urgently assessing its entire prison population to determine which inmates face the most risk from COVID-19, pose the least danger to public safety, and can safely be granted home confinement. Since the Attorney General's memo the Bureau of Prisons dated March 26, 2020, these directives have already resulted in at least 1,805 inmates being placed on home confinement. *See* https://www.bop.gov/coronavirus/faq.jsp. This process necessarily requires the Bureau of Prisons to prioritize the most pressing cases—identifying the best candidates for release, ensuring that their homes are suitable for home confinement, and arranging a way to quarantine each of them for 14 days. Amarrah should not be permitted to throw a wrench in that ongoing process by petitioning the Court, particularly given the absence of any judicial authority to direct or review the Bureau of Prisons' home-confinement decisions.

## ARGUMENT

I. **Federal prisoners are already being considered for home confinement during the COVID-19 pandemic, and Amarrah should not be permitted to cut in line.**

   A. **The Bureau of Prisons has new authority to place federal prisoners in home confinement.**

The Bureau of Prisons is already increasing the placement of federal prisoners in home confinement based on COVID-19, and its authority to do so has now been expanded. Previously, 18 U.S.C. § 3624(c)(2) authorized the Bureau of Prisons "to place a prisoner in home confinement" only "for the shorter of 10 percent of the

term of imprisonment… or 6 months." *Id.* But new legislation now temporarily

permits the Bureau of Prisons to "lengthen the maximum amount of time for which

[it] is authorized to place a prisoner in home confinement." Coronavirus Aid,

Relief, and Economic Security Act (CARES Act), § 12003(b)(2), Pub. Law 116-

136, 134 Stat 281, 516 (Mar. 27, 2020).

In addition, the Attorney General has recently issued two directives to the

Bureau of Prisons, making the finding that triggers the increased statutory

authority under § 3624(c)(2) and ordering the Bureau of Prisons to use the "various

statutory authorities to grant home confinement for inmates seeking transfer in

connection with the ongoing COVID-19 pandemic." (03-26-2020 Directive to

BOP, at 1 (attached as Ex. 1); 04-03-2020 Directive to BOP, at 1 (attached as Ex.

2)). The Attorney General's directives remind the Bureau of Prisons to consider

"the statutory requirements for home confinement." (03-26-2020 Directive to BOP,

at 1). These statutory requirements include the requirements in 18 U.S.C. § 3624(c)

and (g) for home confinement in general, as well as the requirements in 34 U.S.C.

§ 60541(g) for some elderly and terminally ill offenders.

The directives also require the Bureau of Prisons to identify the inmates most at

risk from COVID-19 and "to consider the totality of circumstances for each

individual inmate" in deciding whether home confinement is appropriate. (03-26-

2020 Directive to BOP, at 1). And the directives instruct the Bureau of Prisons to

consider "*all* at-risk inmates—not only those who were previously eligible for transfer" into home confinement. (04-03-2020 Directive to BOP, at 2 (emphasis added)).

In evaluating each inmate under these new directives, the Bureau of Prisons must balance at least four general considerations:

1)  The inmate's age and vulnerability to COVID-19;

2)  Whether home confinement would actually decrease the inmate's risk of contracting COVID-19;

3)  Whether the inmate is at one of the facilities most affected by COVID-19; and

4)  Whether the inmate's release into home confinement would risk public safety.

(03-26-2020 Directive to BOP; 04-03-2020 Directive to BOP). Evaluating the inmate's risk to the public requires assessing not only the inmate's crime of conviction, but also his criminal history, the resources and security level of his prison facility, his proposed home-confinement location, his disciplinary record in prison, and his risk of recidivism. (03-26-2020 Directive to BOP).

Those criteria make sense. The Bureau of Prisons cannot open its facilities' gates indiscriminately and unleash tens of thousands of prisoners, en masse, on the public at large. (04-03-2020 Directive to BOP, at 2–3). That is true in normal

times, and it is particularly true given the strain on our first responders right now. As recent news reports have confirmed, a significant percentage of local law enforcement in many cities has either contracted COVID-19 or been placed under quarantine. Officers who remain on the job are stretched to their limits. Domestic violence is on the rise. Shootings and murders are increasing. *See Detroit cops fight violence spike, social distancing violations with depleted manpower*, Detroit News (Apr. 8, 2020). And innovative criminals are taking advantage of the public's desperation by perpetrating new types of crime—including COVID-19-based fraud schemes. *COVID-19 doctor charged in multimillion-dollar fraud case*, Detroit News (Apr. 28, 2020). There are real risks to public safety right now, and those risks will only increase if communities are faced with a sudden influx of prison inmates. That is just one reason, among many, why the Bureau of Prisons must focus on releasing inmates who are the most vulnerable to COVID-19 and whose release will least endanger public safety.

Another reason is the dilemma that everyone will face if an incorrigible inmate is granted home confinement and then either violates his home-confinement conditions or commits additional crimes. The home-confinement statutes permit—and in some instances, require—the Bureau of Prisons to revoke home confinement and re-incarcerate an inmate if he reoffends. 18 U.S.C. § 3624(g)(5); 34 U.S.C. § 60541(g)(2). This means that if an inmate is released and then

commits a serious crime, the Bureau of Prisons and the justice system will face a

difficult choice: either (i) violate the statute, permit the inmate to remain free, and

give him de facto authorization to continue harming the public as much as he

pleases, or (ii) return the inmate to custody and risk him bringing COVID-19 back

into the prison system, placing other inmates at risk. That is all the more reason to

get the initial release decision right, and it is why the Bureau of Prisons must

carefully consider whether an inmate should be granted home confinement.

> **B.** **Even if Amarrah is eligible for home confinement, he should not be permitted to cut in front of other inmates for consideration by the Bureau of Prisons.**

Amarrah might or might not be granted home confinement under the new

legislation and Attorney General's directives. But either way, he should not be

permitted to push his way in the queue past other inmates. While the Defendant

cites several health issues to support his motion for early release, he downplays his

record and criminal history, as well as his disciplinary history while incarcerated,

which the Bureau of Prisons must also weigh here. All of his behavior

demonstrates a history on non-compliance and illustrates that he would not be a

good candidate for home confinement.

Amarrah played an instrumental role in defrauding Medicare of almost $2

million.  He paid illegal kickbacks to recruiters who referred Medicare

beneficiaries to him, knowing that the vast majority of the Medicare beneficiaries

7

did not need home health services.  Despite his promise to Medicare to the

contrary, he billed Medicare for home health services purportedly rendered to

Medicare beneficiaries that did not need them. Also, and perhaps most concerning,

is that even after pleading guilty, he tampered with witnesses and attempted to

obstruct justice by violating his bond conditions and having deliberate contact with

co-defendants in order to influence them.  Altogether, Amarrah engaged in this

criminal behavior for more than four years. Therefore, it is at least questionable

whether Amarrah would cease engaging in serious criminal conduct.

Lastly, Amarrah continues to minimize his disciplinary record while

incarcerated, as he asserts that he has only received one disciplinary ticket "for

failing to report to his assignment on time."  Dkt 190 at 1-2.  Amarrah's

disciplinary record demonstrates that he has been the subject of three infractions

during his incarceration.  *See* Amarrah Inmate Disciplinary Data, Chronological

Disciplinary Record (attached as Ex. 3).  In addition to his recent citation for

failing to report to his assignment, he was cited in September 2019 for mail abuse

for allowing another inmate to use his email, and was cited for interfering with

taking count in October 2019.  *Id.*

Given Amarrah's record, history of bond violations and disciplinary infractions,

it is also questionable whether he would abide by the terms of home

confinement—much less adhere to the CDC's social-distancing protocols or the

Governor's stay-at-home order.  Time and again, Amarrah has been unwilling to follow even far more basic societal norms, such those prohibiting him from committing fraud for years or abiding by court orders or even basic Bureau of Prison guidelines, such as not letting another person use your email account.  Why would anyone think that he would follow social-distancing protocols or a stay-at-home order? Because Amarrah would be unlikely to remain in home confinement or take those COVID-19 restrictions seriously, he would also be far more likely than other members of the public to contract COVID-19—perhaps even more likely than he would be in prison—and would also be more likely to spread it to other people. But again, that risk to the public, whatever it may be, is one of the factors that the Bureau of Prisons must evaluate in determining whether Amarrah should be granted home confinement.

Further, even if the Bureau of Prisons were inclined to release Amarrah into home confinement, it must first ensure that any home-confinement location is suitable for release, does not place him at an even greater risk of contracting COVID-19, and does not place members of the public at risk from him. (03-26-2020 Directive to BOP; 04-03-2020 Directive to BOP). Although the Bureau of Prisons is expediting that process—particularly at the facilities most affected by COVID-19—it cannot happen overnight; nor can it handle every potentially eligible inmate simultaneously. The Bureau of Prisons, therefore, should be

9

permitted to prioritize the inmates who are least dangerous to the public and most vulnerable to COVID-19. And, Amarrah should not be permitted to interfere with that process by petitioning the Court. *See Wolff v. McDonnell*, 418 U.S. 539, 566 (1974) (cautioning that courts "should not be too ready to exercise oversight and put aside the judgment of prison administrators").

The Bureau of Prisons is also working around the clock to protect any inmates who are not eligible for discretionary release. Inmates at every institution, including FCI Loretto, are being protected by a new shelter-in-place protocol to decrease the spread of the virus. Even prior to the national lockdown, the Bureau of Prisons had already instituted a number of precautionary measures to reduce the risk of infection. A full run-down of those measures is available on the Bureau of Prisons' COVID-19 Action Plan website. Here are the highlights:

- *Detainees Entering the Facility and Current Detainees*. The Bureau of Prisons manages an infectious-disease management program as a matter of course, but in order to address the specific COVID-19 pandemic, its facilities have instituted additional measures, including: (i) all newly-arriving detainees and inmates are screened for COVID-19 exposure risk factors and symptoms; (ii) all newly-arriving detainees and inmates are isolated in quarantine for 14 days as a matter of course, regardless of whether they display any symptoms or exposure risk factors; (iii)

10

asymptomatic detainees and inmates with exposure risk factors are quarantined; and (iv) symptomatic detainees and inmates with exposure risk factors are isolated until medically cleared consistent with current guidelines.

- *Onsite Medical Care*. Routine medical and dental care is offered within the Health Services Department at FCI Loretto offering sick call, emergency treatment, routine treatment and follow-up care in the Chronic Care Clinic.

- *Correctional Officers and Staff*. Enhanced health screening of staff will be implemented in areas with "sustained community transmission" and at medical referral centers.

- *Visitation*. Social and legal visits have been suspended, but inmates have been provided additional phone minutes to communicate with family and friends. Inmates are also able to have confidential phone conversations with legal counsel and requests for in-person visits with counsel will be considered on a case-by-case basis.

- *Other*. Operations and programs for detainees and inmates have been modified to assist with social-distancing efforts.

Although no plan is perfect, these measures will help federal inmates remain

protected from COVID-19 and ensure that they receive any required medical care

during these difficult times.

## II.    The Court should deny Amarrah's motion for compassionate release.

Section 603(b) of the First Step Act of 2018 amended 18 U.S.C. § 3582 to

afford inmates the right to seek compassionate release on their own motion, when

previously only the Bureau of Prisons' Director could do so. But first, inmates

must request compassionate release and exhaust all their administrative remedies

with the Bureau of Prisons, or wait 30 days in the event the Bureau of Prisons fails

to act on their request. 18 U.S.C. § 3582(c)(1)(A). Second, a court may only grant

compassionate release based on an individual inmate's "extraordinary and

compelling reasons," which must be consistent with the Sentencing Commission's

policy statement and which the inmate has the burden of showing. 18 U.S.C.

§ 3582(c)(1)(A); USSG § 1B1.13(1)(A), (3); *United States v. Hamilton*, 715 F.3d

328, 327 (11th Cir. 2013). And third, a court must consider the factors set forth in

18 U.S.C. § 3553(a) and determine that the inmate "is not a danger to the safety of

any other person or to the community." USSG § 1B1.13(2).

### A.    There are no extraordinary and compelling reasons to grant Amarrah compassionate release.

Amarrah is ineligible for compassionate release because there are no

extraordinary and compelling reasons to support his request.  The First Step Act

did not change the substantive requirement that compassionate release be "consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A); *United States v. Saldana*, No. 19-7057, 2020 WL 1486892, at *3 (10th Cir. Mar. 26, 2020). Nor did Congress remove the directive that the Commission, not the judiciary, adopt the policies regarding "what should be considered extraordinary and compelling reasons for sentence reduction." 28 U.S.C. § 994(a)(2)(C) & (t).

In that sense, the compassionate-release standard mirrors the identically-worded standard for sentence reductions under 18 U.S.C. § 3582(c)(2) based on retroactive guideline amendments. In both contexts, the Sentencing Commission's policy statements place "hard limit[s] on a court's ability to reduce the sentence." *United States v. Jackson*, 751 F.3d 707, 711 (6th Cir. 2014). And the Supreme Court has upheld those limits under § 3582(c)(2), stressing that "Congress charged the Commission with determining in what circumstances and by what amount the sentences of prisoners affected by Guidelines amendments may be reduced." *Dillon v. United States*, 560 U.S. 817, 830 (2010). So even when an inmate asks a district court to disregard those limits, the Commission's restraints "on a district court's sentence-reduction authority [are] absolute." *Jackson*, 751 F.3d at 711; *accord United States v. Horn*, 612 F.3d 524, 527–28 (6th Cir. 2010).

13

For compassionate release, the Sentencing Commission has fulfilled Congress's directive in its policy statement in USSG § 1B1.13. That policy statement limits "extraordinary and compelling reasons" to four categories: (1) the inmate's medical condition; (2) the inmate's age; (3) the inmate's family circumstances; and (4) other reasons "[a]s determined by the Director of the Bureau of Prisons." USSG § 1B1.13 cmt. n.1. Unless an inmate's circumstances fall within those categories, he is not eligible for compassionate release. 18 U.S.C. § 3582(c)(1)(A); *Saldana*, 2020 WL 1486892, at \*3; *cf. Dillon*, 560 U.S. at 830.

Amarrah relies on certain medical conditions— including diabetes, hypertensive heart disease, and asthma— to warrant his early release from prison, however there is no evidence that his health conditions rise to the level of a terminal illness or a condition that "substantially diminishes" his ability to provide self-care within his correctional facility. *See* USSG § 1B1.13 cmt. n.1. The Defendant's current medical conditions are not out of the ordinary, nor does Defendant claim they are fatal or untreatable.  Essentially, his request is premised on speculation that his conditions *may* in the future, *if* he contracts a serious case of COVID-19, constitute extraordinary and compelling circumstances.  This falls short.

The BOP, who is in the best position to determine the risks to Amarrah's health and FCI Loretto's ability to mitigate those risks and provide for his care and safety,

recently determined that his medical conditions were not substantial enough to warrant compassionate release. *See* Denial from Warden Moser, April 16, 2020 (attached as Ex. 4); *see also United States v. Garza*, No. 18-1745, 2020 WL 1485782, at *2 (S.D. Cal. Mar. 27, 2020) (in denying defendant's motion for compassionate release, the Court noted that "issues such as Mr. Garza's medical condition, the conditions and resources at Terminal Island (including the availability of testing and treatment), and decisions as to which prisoners should be released because of the COVID-19 epidemic are better left to the Bureau of Prisons and its institutional expertise.")

The BOP's decision to deny his request for compassionate release is consistent with the decisions of other courts faced with the same request from defendants with similar medical conditions, including those housed at facilities that have confirmed cases of COVID-19. *United States v. Shah*, 2020 WL 1934930, No. 16-20457, at *2 (E.D. Mich. April 22, 2020) (denying motion for compassionate release, where no extraordinary and compelling circumstances exist to justify early release based on defendant's medical conditions, diabetes and hypertension, and the generalized risk of contracting COVID-19 and defendant is housed at facility with no confirmed cases of COVID-19); *United States v. Traylor*, 16-cr-20437 (E.D. Mich. April 22, 2020) (Dkt. 301) (attached as Ex. 5) (finding no exceptional and compelling circumstances to warrant compassionate release for defendant with

15

asthma and diabetes and other medical conditions, housed in a facility with one confirmed case of COVID-19, where the defendant's request is based on speculation whether she will have a serious medical condition in the event that she contracts COVID-19.); *United States v. Aguila*, No. 16-00046, 2020 WL 1812159, at \*2 (E.D. Cal. Apr. 9, 2020) (denying motion for compassionate release, where 46 year-old defendant "claims he has high blood pressure, high cholesterol, sleep apnea, and diabetes, [but] fails to provide evidence to verify these claims," and his "arguments about COVID-19 are too general and wide-ranging.")

Additionally, while the Defendant has been diagnosed with some health conditions, he is housed at a facility fully capable of treating him. He does not allege that is unable to get treatment for his current medical conditions. Amarrah has failed to demonstrate how FCI Loretto is incapable of managing and treating him. *See United States v. Gileno*, No. 19-161, 2020 WL 1307108, at \*4 (D. Conn. Mar. 19, 2020) (denial of motion for compassionate release, where defendant, who suffered from high blood pressure and asthma among other medical and mental ailments, "has also not shown that the plan proposed by the Bureau of Prisons is inadequate to manage the pandemic within Mr. Gileno's correctional facility, or that the facility is specifically unable to adequately treat Mr. Gileno.").

The crux of Amarrah's claim is a generalized assertion that he *could* contract COVID-19 and that the virus *could* jeopardize his health, and that the risk of those things happening in prison is greater than the risk of them happening on release. But Amarrah sidesteps an important consideration in that analysis: the likelihood that he would *still* contract COVID-19, even if released. *See United States v. Feiling*, No. 19-112, 2020 WL 1821457 (E.D. Va. Apr. 10, 2020) (denying compassionate release, where 71-year-old defendant housed at FCI Loretto suffers from a variety of ailments, including diabetes and high blood pressure, but he does not show a greater risk of contracting the disease in prison, in relation to his risk in the community).  COVID-19 is—and will continue to be—widespread among the public for many months.

As of April 30, 2020, FCI Loretto has zero confirmed positive cases of COVID-19 for both inmates and BOP staff.  Cambria County, in which FCI Loretto is located, has 25 confirmed cases and 1 death.[2]  Oakland County, Michigan, where the defendant intends to reside if he is released on home confinement has experienced many more cases. As of April 30, 2020, there have been 7,159 confirmed positive COVID-19 cases and 668 deaths in Oakland County, Michigan.[3]  Given this reality, it is hardly clear that Amarrah faces a greater risk in

---

[2] https://www.health.pa.gov/topics/disease/coronavirus/Pages/Cases.aspx (last visited April 30, 2020).
[3] https://www.michigan.gov/coronavirus/ (last visited April 30, 2020).

prison than he would if released. And in any event, Amarrah's speculation on this point is not enough to satisfy § 1B1.13's criteria. *See United States v. Korn*, No. 15-81S, 2020 WL 1808213, at \*6 (W.D.N.Y. Apr. 9, 2020) ("in this Court's view, the mere *possibility* of contracting a communicable disease such as COVID-19, without any showing that the Bureau of Prisons will not or cannot guard against or treat such a disease, does not constitute an extraordinary or compelling reason for a sentence reduction under the statutory scheme."); *United States v. Dungee*, No. 15-00005, 2020 WL 1666470, at \*2 (W.D. Va. Apr. 4, 2020) (denying motion for compassionate release, because the defendant failed to show that his "individual conditions of confinement — as opposed to those conditions that the inmates generally are subject to — are such as to justify relief"); *United States v. Jones*, No. 17-582, 2020 WL 1323109, at \*1 (D. Md. Mar. 20, 2020) (rejecting release requested by incarcerated pregnant detainee on grounds that she is "at increased risk of contracting COVID-19").

Amarrah's request is also premised on his familial circumstances, citing his wife's inability to "adequately care for their children", the lack of quality time she can spend with her children after returning from work each day, and the ability of his mother-in law to watch the children when his wife is at work.  Dkt 190 at 2, 9. As there is no evidence that his spouse has died or become incapacitated, the

familial concerns do not give rise to extraordinary and compelling reasons to justify his early release. *See* USSG § 1B1.13 cmt. n.1.

Nor is Amarrah eligible for compassionate release based on the "other reasons" category. For this category, the Bureau of Prisons has issued Program Statement 5050.50, which contains standards for eligibility that are related to but somewhat more extensive than the first three categories. Amarrah has not shown that he satisfies those standards.

Further, because Congress and the Sentencing Commission have mandated that "other reasons" for eligibility be determined by the Bureau of Prisons, not the judiciary, the Court lacks the authority to grant compassionate release based solely on the general threat posed by the COVID-19 pandemic. *See United States v. Saldana*, No. 19-7057, 2020 WL 1486892, at *3 (10th Cir. Mar. 26, 2020); *United States v. Lynn*, 2019 WL 3805349, at *4-5 (S.D. Ala. Aug. 13, 2019); *United States v. Shields*, 2019 WL 2359231, at *4 (N.D. Cal. June 4, 2019); *United States v. Willingham*, 2019 WL 6733028, at *2 (S.D. Ga. Dec. 10, 2019); *United States v. McGraw*, 2019 WL 2059488, *2 (S.D. Ind. 2019); *United States v. Washington*, 2019 WL 6220984, at *2 (E.D. Ky. Nov. 21, 2019); *United States v. Willis*, 382 F. Supp. 3d 1185, 1187 (D.N.M. 2019); *United States v. Ebbers*, 2020 WL 91399, *4 (S.D.N.Y. Jan. 8, 2020); *United States v. Overcash*, 2019 WL 1472104, at *2

19

(W.D.N.C. Apr. 3, 2019); *United States v. York*, 2019 WL 3241166, at \*4 (E.D. Tenn. July 18, 2019).

Even if that judicial authority existed, the COVID-19 pandemic does not qualify as the type of inmate-specific reason permitting compassionate release. As the Third Circuit explained, "the mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release, especially considering BOP's statutory role, and its extensive and professional efforts to curtail the virus's spread." *United States v. Raia*, __ F.3d __, No. 20-1033, at 8 (3d Cir. Apr. 8, 2020) (opinion amended on Apr. 8, 2020). The Bureau of Prisons has worked around the clock to implement precautionary measures reducing the risk from COVID-19 to Amarrah and other inmates. And if COVID-19, standing alone, qualified as an "extraordinary and compelling reason[]" for relief, there would be no limiting principle: *every* inmate—no matter his actual risk of contracting COVID-19 in prison, no matter his risk of contracting COVID-19 if released, and no matter his risk of developing complications from COVID-19, either in prison or on release—would be presumptively entitled to relief under § 3582(c)(1)(A). Nothing in the statute or USSG § 1B1.13 supports such an unbounded interpretation. *See Raia*, __ F.3d __, No. 20-1033, at 8. Amarrah is not eligible for compassionate release.

20

**B. The factors set forth in 18 U.S.C. § 3553(a) do not support relief.**

Even if an inmate is statutorily eligible for a sentence modification based on an "extraordinary and compelling reason," compassionate release is not necessarily appropriate. Before ordering relief, courts must consider the factors set forth in 18 U.S.C. § 3553(a) and determine that the inmate "is not a danger to the safety of any other person or to the community." USSG § 1B1.13(2). So, even if the Court were to find Amarrah eligible for compassionate release, the § 3553(a) factors and § 1B1.13(2) may still disqualify him.

Amarrah pled guilty to engaging in a sophisticated scheme to defraud Medicare. In fact, Amarrah was a leader or organizer of that conspiracy. He chose to utilize his medical training to steal almost two million dollars from Medicare, and then undertook measures to obstruct justice, including tampering with witnesses, even after he pled guilty.  The Court considered the § 3553(a) factors when it imposed the Defendant's original 60-month sentence. That sentence reflected, among other factors, the seriousness of the Defendant's offense, the history and characteristics of the Defendant, and the need to protect the public from further crimes of the Defendant. Consideration of those § 3553(a) factors weighs heavily in favor of disqualifying him from compassionate release even if he were found to be eligible based on an extraordinary and compelling reason.

21

## Conclusion

Amarrah's motion should be denied.

Respectfully submitted,


MATTHEW SCHNEIDER
United States Attorney


MALISA DUBAL
Assistant Chief
U.S. Department of Justice
Criminal Division, Fraud Section

*s/John J. McCormack*
John J. McCormack
U.S. Department of Justice
Criminal Division, Fraud Section
1400 New York Ave., N.W.
Washington, D.C. 20005
Phone: (202) 262-7011
Email: john.mccormack.iv@usdoj.gov

Date: May 1, 2020

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 1, 2020, I electronically filed the foregoing document with the Clerk of the Court using the ECF system, which will send notification of such filing to counsel for Defendant.

*s/John J. McCormack*_____
John J. McCormack
U.S. Department of Justice
Criminal Division, Fraud Section
1400 New York Ave., N.W.
Washington, D.C. 20005
Phone: (202) 262-7011
Email: john.mccormack.iv@usdoj.gov

Date: May 1, 2020