# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

United States of America,

                    Plaintiff,       Case No. 17-20464

v.                            Judith E. Levy
                                 United States District Judge

Atheir Amarrah,             Elizabeth A. Stafford
                                 Magistrate Judge

                    Defendant.

_____/

# ORDER GRANTING DEFENDANT ATHEIR AMARRAH'S
# MOTION FOR COMPASSIONATE RELEASE [190]

Defendant Atheir Amarrah moves for compassionate release and/or reduction of his criminal sentence pursuant to 18 U.S.C. § 3582(c)(1)(A)(i).

For the following reasons, the Court GRANTS Defendant's motion.

## FACTUAL BACKGROUND

1. Defendant's Background and Criminal History

Defendant Atheir Amarrah is 45 years old. He suffers from the following chronic health conditions: Type II diabetes, hypertensive heart

disease, cardiac arrhythmia, obstructive sleep apnea, and asthma. (ECF No. 190.)

Defendant is currently serving a 60-month sentence at FCI Loretto in Loretto, Pennsylvania after pleading guilty to one count of Conspiracy to Pay and Receive Healthcare Kickbacks, in violation of 18 U.S.C. § 371, and four counts of Payment or Receipt of Kickbacks in Connection with a Federal Healthcare Program, in violation of 42 U.S.C. § 1320a-7b(b)(1)(A). (ECF No. 190, PageID.4508.) From approximately March 2013 through approximately March 2017, Defendant paid a series of illegal kickbacks and bribes to patient recruiters in exchange for the referral of Medicare beneficiaries to Defendant's healthcare company, Prompt Home Healthcare. (ECF No. 98, PageID.462.) Medicare paid Prompt approximately $1.8 million that was intended to pay for home health services, but that was instead laundered by Defendant. (*Id.*)

In August 2018, the Court revoked Defendant's pre-trial bond due to his attempts to obstruct justice. (ECF No. 106, PageID.520.) On two occasions prior to sentencing, Defendant attempted to convince witnesses to fabricate evidence in his favor. (ECF No. 110 at 52:11-22; 54:15-18.) Specifically, Defendant told one witness in a restaurant that "[w]e need

2

to talk! If we all stick together no one will go to jail!" (*See id*.) He then attempted to convince a second witness to sign paperwork fraudulently indicating that she was an hourly employee. (*See id*.) The Court concluded that the government had "come very close" to demonstrating, "by clear and convincing evidence," that Defendant had violated the obstruction of justice statute. (*See id*.) At the time the Court revoked Defendant's bond, it found that Defendant had failed to show by clear and convincing evidence that he was not a danger to the community. (*Id*. at 17:5-23.)

As of May 2020, Defendant has served 21 months out of his 60-month sentence at FCI Loretto. According to Defendant's FCI report, he has received three misconduct tickets at FCI Loretto: one for being "absent from assignment;" one for "mail abuse," in which Defendant let another person use his email account but then denied it; and one for "interfering with taking count," in which Defendant stated that he "did not hear [the guards] call count." (ECF No. 194-4, PageID.4552.) Defendant notes that one of the misconduct tickets was a result of an incontinence incident that required Defendant clean himself before reporting to his assignment. (*Id*.)

2. <u>The COVID-19 Pandemic</u>

On March 13, 2020, the President of the United States declared a national emergency due to the novel coronavirus disease (COVID-19). *Proclamation on Declaring a national Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak*, The White House (Mar. 13, 2020) https://www.whitehouse.gov/presidential-actions/proclamation-declaring-national-emergency-concerning-novel-coronavirus-disease-covid-19-outbreak/. On March 22, 2020, the Governor of Michigan explained that COVID-19 "is a respiratory disease that can result in serious illness or death. It is caused by a new strain of coronavirus not previously identified in humans and easily spread from person to person. There is currently no approved vaccine or antiviral treatment for this disease." Executive Order, No. 2020-20 (Mar. 22, 2020). In Pennsylvania, where Defendant resides at FCI Loretto, the Governor issued a stay-at-home order on April 1, 2020 and recently extended it due to the ongoing need to mitigate the spread of COVID-19. Press Release, *Gov. Wolf, Sec. of Health Extend Statewide Stay-at-Home Order Until May 8* (April 20, 2020), https://www.governor.pa.gov/newsroom/gov-wolf-sec-of-health-extend-statewide-stay-at-home-order-until-may-8/. The Centers for

4

Disease Control and Prevention (CDC) has warned that a case of COVID-19 could be particularly dangerous for individuals with diabetes, heart conditions, or asthma. *People Who Are at Higher Risk for Severe Illness*, Centers for Disease Control, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html. Defendant Amarrah suffers from each of these conditions. (ECF No. 190.)

Since the Court sentenced Defendant in 2019, the exceptionally dangerous nature of the COVID-19 pandemic has become apparent. As of May 7, 2020, there are now 52,915 confirmed cases of COVID-19 in the state of Pennsylvania, where Defendant resides in federal custody, and 3,416 known related deaths. *See COVID-19 Data for Pennsylvania*, Pennsylvania Department of Health, https://www.health.pa.gov/topics/disease/coronavirus/Pages/Cases.aspx. COVID-19 has a high risk of transmission, and the number and rate of confirmed cases indicate broad community spread. Press Release, *Governor Tom Wolf COVID-19 Remarks April 17, 2020* (April 18, 2020), https://www.governor.pa.gov/newsroom/governor-tom-wolf-covid-19-remarks-april-17-2020/ (warning that, despite Pennsylvania's "collective efforts[,] . . . we still have between 1,000 and 2,000 new cases daily and a

national shortage of testing materials"). Nationally, Bureau of Prison (BOP) detention facilities across the country are experiencing similar trends. As of May 7, 2020, BOP has confirmed at least 2,100 cases of COVID-19 among federal inmates and 365 cases among detention facility employees and personnel. *COVID-19 Coronavirus*, Federal Bureau of Prisons, https://www.bop.gov/coronavirus/.

3. Conditions at FCI Loretto

On March 23, 2020, the CDC acknowledged that correctional and detention facilities "present[] unique challenges for control of COVID-19 transmission among incarcerated/detained persons, staff, and visitors." *Interim Guidance on Management of Coronavirus Disease 2019 (COVID-19) in Correctional and Detention Facilities*, Centers for Disease Control (Mar. 23, 2020), https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/guidance-correctional-detention.html. Specifically, the CDC noted that many detention conditions create a heightened risk of danger to detainees. These include low capacity for patient volume, insufficient quarantine space, insufficient on-site medical staff, highly congregational environments, inability of most patients to leave the facility, and limited ability of

incarcerated/detained persons to exercise effective disease prevention measures (*e.g.*, social distancing and frequent handwashing). *Id.*

The CDC recommended that all correctional facilities take preventative measures, including: ensuring an adequate supply of hygiene and medical supplies, allowing for alcohol-based sanitizer throughout facilities, providing no-cost soap to all inmates for frequent handwashing, cleaning and disinfecting frequently touched surfaces several times per day, performing pre-intake screening and temperature checks for all new entrants, increasing space between all detained persons to at least six feet, staggering meals, and having healthcare staff perform regular rounds. *Id.* In its response, the United States indicated that FCI Loretto had taken some of these measures, among others recommended in the BOP "Action Plan:" screening all newly-arriving detainees for COVID-19 risk factors and symptoms; quarantining all newly-arriving detainees for 14 days; isolating all symptomatic detainees; providing onsite medical care; enhancing the screening of FCI Loretto staff; suspending social and legal visits; and modifying programs and operations for detainees to assist with social-distancing efforts. (ECF No. 194, PageID.4532-4533.)

Though the Court commends FCI Loretto for imposing several of the CDC's interim recommendations, Defendant's description of his confinement conditions suggests that many important recommendations remain unimplemented. According to Defendant, inmates currently

> eat, sleep, and interact with each other in a confined space, making it easier for the virus to spread once introduced. Inmates are still being transferred between facilities. Although they are screened for symptoms, they are not tested for the virus, leaving potentially asymptomatic individuals to spread the virus to others. While inmates are being subjected to mandatory quarantine, they are still not provided basic protections from the virus in the facilities. Inmates must purchase their own soap. Hand sanitizer is contraband. In low security facilities, inmates are being quarantined with their own unit, as opposed to individual cells, preventing them from complying with social distancing recommendations. Mr. Amarrah shares a living space with six other inmates, and shares common areas, such as bathrooms, chow halls, and recreation areas, with at least 100 other inmates. Mr. Amarrah does not have the opportunity to practice social distancing at FCI Loretto.

(ECF No. 190, PageID.4507-4508.) The United States does not dispute this description of current conditions at FCI Loretto.

There are currently no confirmed cases of COVID-19 at FCI Loretto, though it does not appear that the facility is conducting widespread COVID-19 tests for inmates or staff. Regardless, Defendant argues that his conditions of confinement, coupled with his underlying medical

8

conditions—diabetes, hypertensive heart disease, and asthma—place him at an increased risk of severe illness and death from a COVID-19 infection in FCI Loretto.

**LAW AND ANALYSIS**

Defendant seeks compassionate release and reduction of his sentence pursuant to 18 U.S.C. § 3582(c)(1)(A)(i). The relevant provision provides:

> (c) The court may not modify a term of imprisonment once it has been imposed except that—
>
>> (1) in any case—
>>
>>> (A) the court, upon motion of . . . the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), after considering the factors set forth in section § 3553(a) to the extent that they are applicable, if it finds that—
>>>
>>>> i) extraordinary and compelling reasons warrant such a reduction.

*Id.*

There are two key questions of law in compassionate release cases. The first is whether a defendant satisfies the statutory requirement to either "fully exhaust[] all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf" or wait 30 days "from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." *Id.* The second is whether extraordinary and compelling reasons, as well as the defendant's own history and characteristics, warrant a reduction of the defendant's sentence. *Id.*

In this case, Defendant has satisfied the statutory requirement to wait 30 days after providing the warden with a request for compassionate release. Defendant's motion indicated that he applied for release in "early April," and the warden denied the request on April 16, 2020. (ECF No. 190, PageID.4505.) The United States did not contest that this condition is satisfied, either in its response brief or during oral argument on May 5, 2020.

As to the second legal question, there are three components to a compassionate release merits analysis: 1) whether extraordinary and compelling reasons warrant a reduction in sentence, as described by the United States Sentencing Commission; 2) whether the § 3553(a) factors—

10

"to the extent that they are applicable"—render the reduction inappropriate; and 3) whether Defendant would be a danger to the public.

The Court finds that these three factors weigh in favor of immediate compassionate release of Defendant. The Court will address each factor in turn below.

### 1. Extraordinary and Compelling Circumstances

In defining "extraordinary and compelling circumstances," the compassionate release statute directs the Court to consider the United States Sentencing Guidelines. 18 U.S.C. §3582(c). United States Sentencing Guideline § 1B1.13 articulates that extraordinary and compelling circumstances exist in the following instances:

(A) Medical Condition of the Defendant.—
(i) The defendant is suffering from a terminal illness (i.e., a serious and advanced illness with an end of life trajectory). A specific prognosis of life expectancy (i.e., a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.

(ii) The defendant is—

(I) suffering from a serious physical or medical condition,

(II) suffering from a serious functional or cognitive impairment, or

(III) experiencing deteriorating physical or mental health because of the aging process,

11

that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

(D) Other Reasons.—As determined by the Director of the Bureau of Prisons, there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C).

*Id.* Here, Defendant argues that his underlying health conditions— diabetes, hypertensive heart disease, and asthma—place him at increased risk of severe illness and death from a COVID-19 infection, making the COVID-19 pandemic an extraordinary and compelling circumstance that justifies compassionate release. Defendant notes that detainees "eat, sleep, and interact with each other in a confined space," that they are not routinely tested for COVID-19, and that detainees are not issued soap or hand sanitizer. (ECF No. 190, PageID.4507-4508.) For these reasons, Defendant argues that his conditions of confinement at FCI Loretto render him highly susceptible to COVID-19 infection, and that his medical conditions render him highly susceptible to a dire outcome from such an infection. These factors, he argues, jointly prevent him from providing self-care within the prison. (*Id.*)

Conversely, the United States argues that "there is no evidence that [Amarrah]'s health conditions rise to the level of a terminal illness or a

12

condition that 'substantially diminishes' his ability to provide self-care within his correctional facility." (ECF No. 194, PageID.4536 (citing U.S.S.G. § 1B1.13 cmt. n.1).) The United States argues that Defendant's request "is premised on speculation that his condition *may* in the future, *if* he contracts a serious case of COVID-19, constitute extraordinary and compelling circumstances." (*Id.*) The United States argues that the BOP "is in the best position to determine the risks to Amarrah's health and FCI Loretto's ability to mitigate those risks and provide for his care and safety." (*Id.* at PageID.4536-4537.) The United States further argues that Defendant has not alleged that he is "unable to get treatment for his current medical conditions," and that he has "failed to demonstrate how FCI Loretto is incapable of managing and treating him." (*Id.*) Finally, the United States argues that, "[e]ven if Amarrah is eligible for home confinement, he should not be permitted to cut in front of other inmates for consideration by the Bureau of Prisons." (*Id.* at PageID.4529.)

The Court begins with this last point. The United States has made a version of the "cutting in line" argument in every compassionate release case that has come before the undersigned, as well as in many compassionate release cases before other judges in the Eastern District

13

of Michigan. *See, e.g.*, *United States v. Charles B. Rizzo*, No. 16-20732, ECF No. 303, Opinion and Order Denying Motion for a Reduced Term of Imprisonment (E.D. Mich. May 1, 2020) (Cleland, J.); *United States v. Aaron Goldfein*, No. 13-20882, ECF No. 266, United States' Response (E.D. Mich. Apr. 27, 2020) (Levy, J.); *United States v. Joseph Saad*, No. 16-20197, ECF No. 62, United States' Response (E.D. Mich. Apr. 21, 2020) (Hood, J.); *United States v. Marvin Brown, Jr.*, No. 19-20202, ECF No. 28, United States' Response (E.D. Mich. Apr. 20, 2020) (Levy, J.).

The argument proceeds as follows: the BOP is currently implementing an internal process to determine which detainees are the best candidates for compassionate release and/or home detention. (ECF No. 194, PageID.4531.) Although the Bureau of Prisons is "expediting that process,"

> it cannot happen overnight; nor can [BOP] handle every potentially eligible inmate simultaneously. [BOP], therefore, should be permitted to prioritize the inmates who are least dangerous to the public and most vulnerable to COVID-19. And, Amarrah should not be permitted to interfere with that process by petitioning the Court.

(*Id.* at PageID.4531-4532.)

This "cutting in line" argument offends the Court. The statute provides for compassionate release motions from a defendant in one of

two circumstances: when the defendant either exhausts his administrative remedies with BOP, or when BOP fails to respond to a defendant's compassionate release request within 30 days. 18 U.S.C. § 3582(c)(1)(A). By providing a 30-day lapse period, Congress specifically contemplated situations—such as the present pandemic—wherein BOP would be unable to manage all urgent and potentially meritorious requests for release. A defendant neither "cuts in line," nor "interfere[s] with [BOP's] process," by exercising his statutory right to seek judicial relief. This argument is without merit and is unhelpful to the Court's understanding of the applicable law or facts.

Next, the Court will address whether extraordinary and compelling circumstances exist that support Defendant's release. To supplement its position, the Government attaches a recent Eastern District of Michigan decision, *United States of America v. Millicent Traylor*, No. 16-20437, ECF No. 301, Order Denying Defendant's Motion for Early Release (E.D. Mich. Apr. 22, 2020). In *Traylor*, the Honorable Robert H. Cleland found that a defendant's "asthma, diabetes, obesity, and recent surgery" did not constitute extraordinary and compelling reasons justifying compassionate release in a BOP facility where there was one confirmed

15

outbreak. *Id.* Judge Cleland concluded that "[t]he court is asked to speculate as to whether Defendant will eventually have a sufficiently serious medical condition . . . *if* she were to contract a serious case of COVID-19 . . . [t]he court will not do so." *Id.*

The Court acknowledges that some courts, including the *Traylor* court, have ruled that a detainee's medical conditions in light of COVID-19 do not constitute extraordinary and compelling reasons for compassionate release. *See id.* Conversely, many courts have found that, for high risk individuals, communal prison confinement conditions satisfy the definition of "extraordinary and compelling reason for release" because they make it impossible for vulnerable individuals to "protect [them]selves from the spread of a dangerous and highly contagious virus." *See, e.g.*, *Saad*, No. 16-20197, ECF No. 64, PageID.689 (finding that Defendant's age, chronic kidney disease, hypertension, and sleep apnea are extraordinary and compelling reasons for release in light of the COVID-19 pandemic); *Miller v. United States*, No. 16-20222, 2020 WL 1814084, at *3 (E.D. Mich. Apr. 9, 2020); *United States v. Perez*, No. 17 CR. 513-3, 2020 1546422, at *4 (S.D.N.Y. Apr. 1, 2020). The persuasive legal authority conflicts on this subject, which reflects the highly

individualized inquiry posed by all compassionate release cases—particularly during this extraordinary pandemic.

FCI Loretto does not have any confirmed cases, and the United States argues that this should be a compelling factor in the Court's analysis. However, it is unclear whether or to what extent FCI Loretto is testing the existing inmate population, and the United States' brief is silent on this issue. Indeed, when the Court questioned counsel for the United States during oral argument, he responded that he "d[id] not know" how or if FCI Loretto was conducting COVID-19 testing of its detained population.

Zero *confirmed* COVID-19 cases is not the same thing as zero COVID-19 cases. The Bureau of Prisons recently discovered this when it found that 70 percent of the inmates it tested were positive for the disease. *See* Sadie Gurman, *More Than 70% of Inmates Tested in Federal Prisons Have Coronavirus*, The Wall Street Journal (Apr. 30, 2020), https://www.wsj.com/articles/more-than-70-of-inmates-tested-in-federal-prisons-have-coronavirus-11588252023 (noting that "prison officials expect [this number] to rise as they expand testing with a focus on the hardest-hit facilities"). The Southeast Regional Vice President of the

17

Council of Prison Locals referred to "the inside of a[ prison] institution" as a "little petri dish . . . a life and death situation [that prison officials then take] home to our families." *Id.* This disease spreads asymptomatically, which means the Court and the prison system can take no comfort in a lack of confirmed cases, and all parties should be deeply concerned by the lack of universal testing of inmates and staff. *See How COVID-19 Spreads*, CDC (Apr. 3, 2020), https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-covidspreads.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fprepare%2Ftransmission.html.

For these reasons, unless and until FCI Loretto implements a universal testing regimen, the Court gives no weight to the zero "confirmed" COVID-19 cases statistic—particularly because BOP is housing detainees together, because the United States could not give the Court any information regarding current testing practices, and because basic disinfecting tools such as soap and hand sanitizer are not universally provided to the population. To the contrary, the Court finds that the lack of testing aggravates its concerns about Defendant's likelihood to contract COVID-19 while in federal custody. Accordingly,

the Court finds that extraordinary and compelling circumstances warrant a reduction of Defendant's sentence. The current conditions of Defendant's confinement at FCI Loretto, which Defendant has no power to alter, expose him to a substantial risk of contracting COVID-19. And Defendant's numerous medical conditions render him substantially likely to suffer a dire outcome should he contract the virus. Together, these factors require the Court to conclude that Defendant is suffering from a serious physical or medical condition that "substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which [he] is not expected to recover." 18 U.S.C. § 3582(c)(1)(A)(i).

The Court sentenced Defendant to 60 months in prison; it did not sentence him to death or to incarceration that carries a significant risk of death. Defendant has demonstrated that extraordinary and compelling circumstances warrant compassionate release.

2. § 3553(a) Factors

The compassionate release statute directs courts to consider the § 3553(a) sentencing factors "to the extent that they are applicable." 18 U.S.C. § 3582(c)(1)(A). These factors include:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;
(2) the need for the sentence imposed—

> **(A)** to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> **(B)** to afford adequate deterrence to criminal conduct;
> **(C)** to protect the public from further crimes of the defendant; and
> **(D)** to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available;
(4) the kinds of sentence and the sentencing range established for—
(5) any pertinent policy statement—
(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
(7) the need to provide restitution to any victims of the offense.

Careful consideration of these factors previously led the Court to impose a sentence of 60 months in prison. Using the same analysis, the Court will release Defendant from federal custody, but it will not restore Defendant's liberty until his sentence is completed. Defendant will serve a period of supervised release, including a period of home confinement, equal to what would have been the remainder of his time at FCI Loretto. Defendant will then serve the three-year term of supervised release that was part of his original sentence, without the home-confinement condition. (ECF No. 183.)

20

3. <u>Danger to the Community</u>

Sentencing guideline § 1B1.13 further specifies that a reduction in sentence is only appropriate if "the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)." U.S.S.G. § 1B1.13.

Neither party substantially addressed whether Defendant would pose a danger to the community, though the United States suggested that Defendant's criminal history demonstrates his inability to follow stay-at-home protocols because Defendant "has been unwilling to follow even far more basic societal norms, such as those prohibiting him from committing fraud for years or abiding by court orders or even basic Bureau of Prison guidelines, such as not letting another person use [his] email account." (ECF No. 194, PageID.4531.)

The Court finds that Defendant will not pose a danger to the community. Defendant did not have a criminal history prior to his fraud scheme. Though the Court condemns Defendant's past conduct and his abuse of one of the country's most important social programs, this offense is unlikely to predict future dangerous behavior of the kind that would obviate compassionate release. Defendant's infractions while

incarcerated—letting another individual use his email account and denying he did so, arriving late to a roll call, and arriving late to an assignment because of a personal accident—were addressed during the oral argument and do not merit further consideration. Further, although the Court previously revoked Defendant's bond because he attempted to tamper with witnesses, that behavior was specific to the case and there are no signs that Defendant has engaged in similar conduct prior to or while in custody. Finally, the Court is unpersuaded that Defendant's past fraudulent conduct predicts a refusal to abide by social distancing guidelines. He will additionally be living with a doctor: his wife. The Court made clear to Defendant during his motion hearing that, though it is releasing Defendant, it is holding him to a zero-tolerance policy.

Accordingly, the Court finds that Defendant will not pose a danger to the public and that compassionate release is appropriate.

**RELIEF**

The Court is aware that it does not have statutory authority to order that Defendant's current sentenced be modified to home confinement. *See, e.g.*, *Miller*, 2020 WL 1814084, at *2. Nor may the

Court review BOP's internal confinement decision to deny compassionate release. *Crowe v. United States*, 430 Fed. Appx. 484 (6th Cir. 2011).

Therefore, the Court reduces Defendant's sentence to time served. The Court imposes a new term of supervised release of 75 months, of which the first 12 months shall be served in home confinement. The next 27 months shall be served without the home confinement condition, but with a curfew, the details of which are to be determined by the Probation Department. The final 36 months shall be served according to the original conditions of Defendant's three-year supervised release term that the Court imposed upon Defendant during his October 2019 sentencing. Defendant's supervised release shall include electronic location monitoring, to commence as soon as the Probation Department can safely install the necessary electronic monitoring equipment and upon such other conditions as the Probation Department deems necessary.

**CONCLUSION**

Accordingly,

IT IS ORDERED that Defendant's Motion for Release from Custody (ECF No. 190) is GRANTED;

IT IS FURTHER ORDERED that Defendant's sentence of imprisonment is reduced to time served;

IT IS FURTHER ORDERED that BOP shall release Defendant immediately after holding him for a 14-day quarantine period at FCI Loretto;

IT IS FUTHER ORDERED that, immediately upon release, Defendant shall commence a new term of supervised release of 75 months;

IT IS FURTHER ORDERED that Defendant shall serve the first 12 months of supervised release under home confinement, with electronic location monitoring to commence as soon as the Probation Department can, upon its own determination, safely install the necessary electronic monitoring equipment and upon such other conditions as the Probation Department deems necessary;

IT IS FURTHER ORDERED that, after serving in home-confined supervised release for 12 months, Defendant will serve the next 27 months without the home-confinement condition but with a curfew, the details of which shall be imposed by the Probation Department;

IT IS FURTHER ORDERED that Defendant's final 36 months shall be served according to the original conditions of Defendant's three-year supervised release term that the Court imposed upon Defendant's October 2019 sentencing;

IT IS FURTHER ORDERED that additional conditions will be included in the Court's amended judgment;

IT IS FURTHER ORDERED that this Order replaces the Court's October 2019 designation of supervised release.

IT IS SO ORDERED.

Dated: May 7, 2020                       s/Judith E. Levy
Ann Arbor, Michigan                      JUDITH E. LEVY
                                         United States District Judge


## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on May 7, 2020.

                                         s/William Barkholz
                                         WILLIAM BARKHOLZ
                                         Case Manager

25